UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                                         :

TREVOR CHARLES CLARKE,             :        04 Civ. 1440 (RJH)

                    Plaintiff,        :

                                    :        **MEMORANDUM**
        - against -                 :        **OPINION AND ORDER**

AETNA LIFE INSURANCE COMPANY,  :

                    Defendant.    :

------------------------------------------------------------x

       This diversity action is brought by plaintiff, Trevor Charles Clarke ("Clarke"), against defendant, Aetna Life Insurance Company ("Aetna"), challenging Aetna's decision to terminate Clarke's long term disability benefits. Clarke alleges that Aetna's termination breached the insurance contract between Aetna and his employer and seeks damages and declaratory relief. Aetna moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure against Clarke's complaint in its entirety. For the reasons stated below, Aetna's motion [24] is denied.

## BACKGROUND

       The following facts are derived from the pleadings, affirmations, declarations, and attachments submitted in connection with the motion. The facts are undisputed except where indicated. Until October 1998, Clarke, a British citizen, was a partner in the law firm of Garretts & Co ("Garretts"), responsible for the firm's pension practice in the United Kingdom. (Compl. ¶¶ 2, 5, 6.) Pursuant to that employment, plaintiff was insured under a policy of long-term disability insurance issued by Aetna to Arthur Andersen

Worldwide, with which Garretts is affiliated. (Mahajan Decl. Ex. 1.) In March 1998, Clarke suffered a severe depressive episode in which he experienced paranoid delusions and psychotic symptoms, and which required his hospitalization. (Compl. ¶ 8.) While both parties agree that the episode was induced by stress, the sources of that stress, and their relative importance, are in dispute. Obvious stressors included a pending malpractice suit related to work Clarke had performed, professional pressure, and personal relationship difficulties. (Mahajan Decl. Ex. 24 ¶¶ 38, 40; TCC[1]-177; Robertson Tr. 97.) Aetna correctly notes that up to this point, Clarke had worked for twenty years as a solicitor, including three and a half years as head of the pension department at Garretts, without any mental health problems. (Mot. 2.) Plaintiff submitted an application for benefits, and after a one-year waiting period pursuant to the insurance policy, Aetna determined that Clarke qualified for long term disability benefits. (Mahajan Decl. Ex. 5.) The August 3, 1999 letter granting Clarke benefits set the payment levels and stated that the "plan requires that we will periodically re-evaluate your eligibility by requesting updated medical information from your attending physician or an independent physician of our choice." (*Id.*)

After an absence following the onset of his depressive episode, Clarke returned to Garretts to discuss his future with the firm. A Supplemental Employer's Statement submitted to Aetna noted that prior to his absence, "the performance of the Pensions practice had definitely reached a plateau" and that Clarke's style "is often at conflict with the Andersen's/Garrett's style." (Mahajan Decl. Ex. 26.) At a meeting held on July 30, 1998 between Clarke and Garretts, it was established that Clarke could not return to Garretts in his former capacity, but that he would see a firm-appointed doctor to evaluate whether he might return in a part-time capacity. (Mahajan Decl. Ex. 27.) At several

---

[1] TCC refers to the pagination of documents attached to the affirmation of Scott Reimer, plaintiff's counsel.

2

points, the notes from the meeting discuss "encouraging Trevor to retire from Garretts." (*Id.*) Clarke tendered his notice of resignation in September 1998, which became effective in October. (Mahajan Decl. Ex. 25.) According to Clarke, upon visiting the firm-appointed doctor, he was forced to resign from Garretts or be removed as a partner. (Clarke Dep. 282–83; Mahajan Decl. Ex. 28.)

Clarke sought help shortly after his depressive episode. He first went to see Dr. Smith, a psychiatrist at Kidderminster General Hospital, from April to July 1998. On June 18, Smith wrote "I think it would be premature to rush back into a return to work at this stage as on current evidence he clearly would not manage it." (TCC-105.) After his final meeting with Clarke in July, Smith wrote that "[w]hilst these conditions are currently impairing [Clarke's] ability to work I believe them to be fully remedial so that [he] should regain his former mental health and be in a position to return to work." (Mahajan Decl. Ex. 22) Clarke was then transferred to the care of Dr. Khan, at the same hospital, and from July 1998 until March 1999, Clarke had over ten appointments. (Mahajan Decl. Ex. 4.) On August 28, 1998, Khan wrote that "I would anticipate that [Clarke] will be able to return to work, eventually fulltime. . . . My view of the timescale likely for full recovery would be in the order of two or three months maximum. It is quite possible that recovery may complete before then.   Mr. Clarke may well be able to work normally in a matter of weeks, however whilest he is showing good improvement, it is not possible to be definite at this time." (Mahajan Decl. Ex. 21.) The notes from the last meeting of March 10, 1999 stated that Clarke "is now substantially recovered from his depression," and that he had temporarily chosen not to take his medication (Lithium and anti-depressants), although at the doctor's suggestion he was considering whether to restart the medication. (Mahajan

Decl. Ex. 30.)  After this meeting, Clarke wrote a letter to a colleague at Garretts inquiring about the firm's permanent health insurance policy (not through Aetna) for which Garretts had stated he was ineligible.  (Mahajan Decl. Ex. 28.)  In that letter, Clarke noted that Khan had told him that pressure and stress could trigger a relapse and "although I am now mentally capable of returning to a [sic] my old job . . . I should consider the wisdom of so doing."  (*Id.*)  In an Attending Physician's Statement submitted to Aetna on April 23, 1999, Khan noted under the "mental/nervous impairment" section that "patient currently still improving—not fully recovered."  (Mahajan Decl. Ex. 20.)  Under "limitations," Khan wrote that Clarke was under "no psychiatric restriction but advised to avoid stress."  (*Id.*)

Thereafter, Khan left to go to another hospital, and Clarke began to see Dr. Robertson, the senior psychiatrist at Kidderminster, seeing him once in June 1999 and once in February 2000.  (Mahajan Decl. Ex. 4.)  In a fax to Aetna immediately following the June appointment, Robertson responded to an inquiry about whether Clarke had reached maximum improvement or when he might by stating he was "[n]ot entirely well.  Possibly another 6 months.  Still improving."  (Mahajan Decl. Ex. 32.)  He went on to state that Clarke could presently practice his profession "on a part time basis," that he was taking Lithium and anti-depressants with out-patient support and monitoring, and that he should be able to return to work full-time in six months.  (*Id.*)  Several days later, Robertson sent a letter to Clarke's family doctor about Clarke's condition, conveying that "[h]e was alert, composed, euthymic and entirely in touch with reality."  (Mahajan Decl. Ex. 34.)  He also noted that Clarke had encountered problems going off his medication in the Spring, and had "wisely" decided to return to taking them.  (*Id.*)  As noted, in August 1999, Aetna

4

determined that Clarke was entitled to long term disability payments under the policy, and began making payments.

Several months later, on October 7, 1999, Robertson wrote a letter to Aetna "confirm[ing] the advice given by Dr. Khan that [Clarke] should in the future avoid the high levels of stress to which [he was] exposed while a partner in the law firm Garretts . . . . Ignoring this advice will increase the risk of a relapse into severe clinical depression."[2] (Mahajan Decl. Ex. 31.)  He continued, "I regard the advice given above as affecting the rest of your working life up to retirement.  For purposes of your insurance arrangements with Aetna I confirm that in my view you are therefore permanently disabled from returning to your Garretts job or one like it. . . .  [O]nce you have had one bout of severe clinical depression there is always a risk of relapse." (*Id.*)  Finally, with regard to his understanding that Aetna would require a medical certificate every three months, Robertson stated that "my advice will be the same each time I am asked to provide a certificate: in these circumstances you may care to ask Aetna if they still require certificates so regularly."  (*Id.*)  Clarke faxed Robertson's letter to Aetna on October 18, 1999, and inquired whether, pursuant to the paragraph concerning medical certificates, Aetna "still wish[ed Clarke] to submit medical certificates (i.e. Mental Health Provider Statements) every three months."  (TCC-48–53 ¶ 7.)  Clarke received no response.  At this point, Clarke had begun to work part-time as a consultant for the law firm of Martineau Johnson, working two days per week.  (TCC-87; Mahajan Decl. Ex. 29.)  The firm noted that while Clarke was a "meticulous and clever lawyer," he "never was interested in taking

---

[2] Aetna draws the Court's attention to a letter sent by Clarke to Robertson attaching a suggested draft for a letter Clarke asked Robertson to send to Aetna "cover[ing] all the points [Clarke] need[ed] to get across to the insurers." (Mahajan Supp. Decl. Ex. 1.) However, the draft letter is not attached so the Court is unable to compare the two.  Moreover, it is not the Court's role on a motion for summary judgment to assess the weight to be accorded a piece of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

5

on a fill work commitment," but did not elaborate.  (Mahajan Decl. Ex. 29.)  Robertson approved of this temporary work as the "stress and work load is much reduced compared with Garretts."  (Mahajan Decl. Ex. 31.)

Because Robertson was retiring, he discharged Clarke to Dr. Hyde, his family doctor, "with the suggestion that you refer him back to the appropriate Sector psychiatrist in due course."  (Mahajan Decl. Ex. 35.)  In a letter to Hyde following Robertson's final meeting in February 2000, Robertson referred to a "number of current stresses," including Clarke's part-time work at Martineau Johnson, but stated that Clarke had "wisely taken a precaution of arranging a couple of months off work."  (*Id.*)  Robertson found Clarke's mood at the final meeting to be "satisfactory" and stated that "he shows no clinical features of depression."  (*Id.*)  Clarke was still on Lithium and anti-depressants at the meeting, but Robertson suggested that in a few months "we might then be able to get him off the anti-depressant and maintain him on the Lithium alone or even nothing."  (*Id.*)

In October 2000, Robert Seccombe, the case manager for Clarke's long-term disability claim, began an investigation.  Seccombe sent an interviewer to Clarke's home in the United Kingdom to acquire information about his employment with and earnings from Martineau Johnson, and from what providers and facilities he had obtained treatment from October 1, 1999 to that date.  (Mahajan Decl. Ex. 6.)  In the report from that interview held on December 12, 2000, the investigator described Clarke's recent activities, including legal disputes with Martineau Johnson and concerning a real estate transaction, and his future plan to train as a ski instructor and eventually combine continuing legal education with ski instruction in the Alps.  (Mahajan Decl. Ex. 8.)  Clarke explained that he was seeing Robertson as needed and that after accidentally forgetting his Lithium tablets at home on a

6

February 2000 trip and suffering no ill-effects, he had decided not to return to taking them. (*Id.*) At the meeting and subsequently thereafter, Clarke refused to sign an authorization form allowing Aetna to request information directly from Martineau Johnson and his doctors.

As of the December 2000 meeting, Clarke had not seen Robertson for almost ten months. However, he had been to Dr. Hyde, his family doctor, in March, May, and October of 2000. (TCC-9.) Neither party presents evidence as to the March meeting. The notes from the May meeting suggest that although Clarke's mental health was discussed, he told the doctor that he "feels absolutely fine," that he had been off his medication for several months, and that he "no longer wants to be partner in firm." (Mahajan Decl. Ex. 36 at 12.) The October meeting appears to have been for an influenza vaccination. (*Id.*) Clarke had one more appointment with Hyde in March 2001 prior to his benefits being terminated, where he obtained a referral to an orthopedist for a fracture of his left arm sustained while training to become a ski instructor. (*Id.* at 11–12.) Of course, at any of these meetings, mental health may have been discussed, but simply not have appeared in the medical records.

After the December 2000 interview, Clarke sent a follow-up letter to Aetna. (TCC-32–34.) In that letter, he explained that he had not signed the authorization form because it was worded too broadly and would allow Aetna to approach Martineau Johnson, his client, about his mental health. He also included information concerning his payments from Martineau Johnson and future prospects and enclosed a report prepared by his accountant. This apparently satisfied Aetna, who did not contact Clarke from December 2000 until October 8, 2001. On that date, Seccombe sent an e-mail requesting additional information

7

in order to evaluate Clarke's disability claim. (TCC-68.) Attached were a letter, a mental health provider's statement to be completed by his treating physician, and an authorization form. The letter sought information on all the providers and facilities where Clarke had received treatment from January 1, 2001 until that date, including complete medical records if Clarke chose not to sign the attached authorization form. (Mahajan Decl. Ex. 12.) The letter also sought an update on Clarke's financial ventures, including with Martineau Johnson and ski instruction.

Clarke responded the next day, October 9, 2001, describing his reasons for not signing the authorization form, his efforts to supplement his income, including a number of ongoing lawsuits, and further stated:

> In connection with the mental health providers statement I would mention that I have not, since 1 january 2001, felt it necessary to consult my family doctor (he and I have agreed that I would consult him if I felt any serious anxiety recurring and that he would not appoint a new consultant to replace the retired Dr. Robertson unless it became necessary). With the permission of my family doctor I have not been taking any medication. accordingly there is nothing for my family doctor to report upon and therefore unless you instruct me to the contrary I shall not send the form to him. at the present time I continue to manage my daily life in accordance with the advice from my consultant, Dr. Robertson, (now retired) contained in his letter to me dated 7 October 1999.

(Mahajan Decl. Ex. 13.) After receiving this e-mail, Seccombe referred the case for review by Aetna's nurse practitioner who, on October 11, 2001, strongly suggested the termination of Clarke's claim. (Mahajan Decl. Ex. 15.) On October 24, 2001, Aetna sent a letter to Clarke terminating his benefits. (Mahajan Decl. Ex. 16.) After defining total disability, the letter stated that Clarke was not under the "regular care and attendance of a physician," as required by the plan, and had stopped taking medication. It further stated

that Aetna had no records or "medical information to substantiate that [Clarke] remain[s] totally disabled as defined under the plan" after the letter from Robertson in October 1999. Pursuant to Aetna's appeal process, the letter invited Clarke to submit any additional information that may help in the evaluation of his claim. Clarke submitted certain additional information; however, in letters dated February 26, 2002 and July 30, 2003, Aetna denied Clarke's first and second appeal, again focusing on the lack of any medical documentation after Robertson's October 7, 1999 letter and the failure to satisfy the regular care requirement. (Mahajan Decl. Exs. 18–19.) Clarke filed this complaint in the District Court of the Southern District of New York on February 19, 2004 seeking monetary damages and declaratory relief.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party can satisfy its burden by showing that the opposing party is unable to establish an element essential to that party's case and on which that party would

bear the burden of proof at trial.  See *Celotex*, 477 U.S. at 321; *Gallo v. Prudential Servs*., 22 F.3d 1219, 1223–24 (2d Cir. 1994) (A "moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  Indeed, summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998).

If the moving party meets its burden, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); Celotex, 477 U.S. at 322–23.  An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).  Specifically, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.  See *id.* at 256–57; *Gross v. Nat'l Broad. Co*., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

## DISCUSSION

In a diversity action such as this one, a court must apply the substantive law of the state in which it sits, New York in this case. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Under New York state law, the court construes an insurance policy, like other contracts, to give effect to the parties' intent as expressed by their words. *Dicola v. American S.S. Owners Mut. Protection & Indem. Assoc.*, 158 F.3d 65, 77 (2d Cir. 1998). If the language of the policy is clear and unambiguous, the court must enforce it as written.

10

*Village of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995). If the insurance contract provision is ambiguous, the Court "may accept any available extrinsic evidence to ascertain the meaning intended by the parties. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998); *see also Hartford Accident & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973). "Where extrinsic evidence is conclusory or does not shed light upon the intent of the parties, a court may resort to the contra proferentem rule of contract construction and construe any ambiguities in the contract against the insurer as a matter of law." *Morgan Stanley Group v. New England Ins. Co.*, 36 F. Supp. 2d 605, 609 (S.D.N.Y. 1999) (citations omitted); *see also Miller v. Continental Ins. Co.*, 358 N.E.2d 258 (N.Y. 1976) (New York follows the "hornbook rule that policies of insurance ... are to be liberally construed in favor of the insured."). Aetna argues that it properly terminated disability benefits to Clarke under the unambiguous terms of the policy because (1) he was not under the regular care and attendance of a physician, and (2) he failed to provide updated medical information. In its reply memo (Reply 6–10), Aetna contends directly that there is no evidence in the record that Clarke was permanently disabled, thus justifying its decision to terminate benefits. The Court will address these arguments seriatim.

### 1.      Regular Care and Attendance Requirement

Aetna argues that it can permanently terminate benefits if an insured fails to comply with the regular care and attendance provision found in the policy. While such an interpretation is tenable, it is not the only reasonable interpretation nor is it dictated by the unambiguous language in the policy. Indeed, Clarke's interpretation, that noncompliance with the regular care and attendance requirement only permits the denial of benefits during

the period in which regular care is lacking, is the more reasoned interpretation.  At most, there is ambiguity, and in the absence of extrinsic evidence as to the parties' intent, the Court will construe the policy against the insurer.  *See I.V. Servs. of Am., Inc. v. Trustees*, 136 F.3d 114, 121–22 (2d Cir. 1998).

In the eligibility section, under the subheading "Exclusions and Limitations," the policy states "Aetna will not pay for any disability . . . [d]uring which a covered individual is not under the regular care and attendance of a physician."  (Mahajan Decl. Ex. 1 at 11.)  Plaintiff argues, with some force, that the use of the phrase "during which" denotes temporality and only permits Aetna to decline benefits during the period of time the insured is not under regular care.  (Opp. 11.)  Any other interpretation, plaintiff contends, would render the phrase meaningless.  (*Id.*)  *See* 10 Lee R. Russ, Couch on Insurance § 146:26 (3d ed. 1998) ("Where the policy requires that the insured be regularly attended by a physician during the period of his or her disability, there can be no recovery for that portion of the disability *during which* the insured was not so attended.") (emphasis added).

Moreover, the placement of the requirement in the policy suggests that noncompliance was only intended to result in temporary non-payment during the period of noncompliance.  The previous subheading in the benefits section provides for when payment of benefits will cease entirely.  These include: the "Benefit Expiration Date," "The day the employee is able to perform all of the material duties of his or her regular occupation on a full-time basis," "The day the active partner retires," "The day of the covered individual's death," and "The first day of the month in which the current monthly earnings exceed 80% of the Basic Monthly Earnings prior to disability."  (Mahajan Decl. Ex. 1 at 10.)  Rather than being included with these other factors causing permanent

12

termination of payments, the requirement is separately placed under an exclusions and limitations heading, suggesting noncompliance does not result in permanent termination of benefits.  Nor is the requirement contained within the definition of disability.  In that case, a failure to comply would justify a finding that the insured was no longer disabled for purposes of the policy and thus would have to resubmit a claim after he or she again resumes regular care.

Aetna refers the Court to three cases where a similar provision was interpreted as providing for the permanent termination of benefits.  However, all three cases are distinguishable.  In *Keogan v. Towers, Perrin, Forster & Crosby, Inc.*, No. 02-865, 2003 U.S. Dist. LEXIS 7999, 2003 WL 21058167 (D. Minn. May 9, 2003) and *Gravatt v. Paul Revere Life Ins. Co.*, No. CV982166, 2005 U.S. Dist. LEXIS 25583, 2005 WL 2789315 (D. Ariz. Oct. 25, 2005), the regular care provisions were part of the definition of total disability, and noncompliance therefore justified a determination that the insured was no longer disabled and entitled to benefits.[3]  In the policy in this case, the definition of disability is found in section VII, and makes no reference to regular care.  Nor is the regular care provision found in the list of terminating events found at Section II(C)(2).  In *Rosenberg v. Guardian Life Ins. Co of Am.*, No. 00 Civ. 8198 (DLC), 2002 U.S. Dist LEXIS 24683, 2002 WL 31885930 (S.D.N.Y. Dec. 30, 2002), the court upheld the insurer's decision to permanently terminate benefits due to noncompliance with a regular

---

[3] This was also the case in *Heller v. Equitable Life Assurance Society*, 833 F.2d 1253 (7th Cir. 1987).  Moreover, the ultimate holding in *Heller* was only that a regular care and attendance requirement did not require insured to undergo surgery, not that noncompliance justified permanent termination of benefits.  *Id.* at 1257 (purpose of clause requiring insured to be "'under the regular care and attendance of a physician' is to determine that the claimant is actually disabled, is not malingering, and to prevent fraudulent claims; [it] is not intended to allow the insurer to scrutinize, determine, and direct the method of treatment the claimant receives").

13

care provision under a deferential arbitrary and capricious standard.[4]  Despite the phrasing of the limitation—"We don't pay benefits for any period during which the employee is not under the care of a doctor."—the plaintiff did not suggest to the court the alternative, and rather obvious interpretation that noncompliance only justifies temporary nonpayment, but instead argued that the requirement should not apply because treatment would be futile.

The Court considers the plaintiff's interpretation of the regular care requirement, on balance, to be correct.  Thus, the Court finds that noncompliance with the regular care requirement does not by itself justify the permanent termination of Clarke's benefits.  *See Stinnett v. Northwestern Mutual Life Ins. Co.*, 58 F. Supp. 2d 1000, 1006 (S.D. Ind. 1999) ("Because [plaintiff] was not under the care of a licensed physician from December 23, 1993, to September 13, 1995, he is not entitled to recover disability benefits for that time period.")  Benefits are not to be permanently terminated until the insurance ends as provided by Section II(D)(1), a terminating event occurs as provided by Section III(c)(2), or the insured is no longer disabled under the definition provided in Section VII(20).

## 2.     **Failure to Provide Updated Medical Information**

While the parties strategically omit any facts concerning requests for medical information that contradict their story, there is actually no dispute.  In August 1999, Aetna approved Clarke's disability claim and stated that his "plan requires that we will periodically re-evaluate your eligibility by requesting updated medical information." (Mahajan Decl. Ex. 5.)  In October 1999, Clarke submitted a mental health provider statement and letter from Robertson explaining that all subsequently filed statements

---

[4] In ERISA cases, where "an insurance plan gives its administrator broad discretion to constue the terms of the plan and to determine whether a claimant is entitled to payment of benefits, a court may reverse the administrator's decision only if it is arbitrary and capricious." *Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 650 (2d Cir. 2002).  ERISA law does not govern here because plaintiff is a British citizen and because he was a partner, rather than an employee, at Garretts.

14

would contain the same information and faxed an inquiry as to whether he should continue providing those statements nonetheless. (TCC-52.) He received no response. In December 2000, Seccombe sent an interviewer to obtain information about recent visits to doctors or facilities and to procure an authorization to request medical documentation directly. Clarke refused to sign the form and stated that he was, at present, only seeing his family doctor and not taking any medication. In a follow-up letter, Clarke explained why he refused to sign the form, and provided further information on his relationship with Martineau Johnson, as requested. (TCC-32–33 (authorization form "is too widely drafted for the reasonable purposes of disclosure to Aetna. . . . I do not want Aetna or any of its agents approaching any client of mine direct for business reasons which should be self evident.").) Again, Clarke received no response. Then, on October 8, 2001, Aetna requested that Clarke send updated medical information or sign an authorization form. (TCC-68; Mahajan Decl. Ex. 12.) Clarke responded by e-mail the following day that "there is nothing for my family doctor to report upon and therefore unless you instruct me to the contrary I shall not send the form." (Mahajan Decl. Ex. 13.) Aetna clearly found his response unsatisfactory, and terminated his benefits two weeks later. (Mahajan Decl. Ex. 14.)

Aetna argues that the requirement that the insured submit updated medical information arises from Section VI(B) which states: "Proof of Loss – The form [for psychiatric illness, a mental health provider statement] is due within 90 days after the end of the Waiting Period, and thereafter at least once each 90 days as long as the covered individual is disabled." (Mahajan Decl. Ex. 1 at 27). Section VI(C) states that "[b]enefits will be paid monthly not more than thirty-one days after Aetna receives acceptable proof of

15

loss." (*Id.*)  It is undisputed that Clarke did not send, nor was Aetna able to obtain, an updated medical statement from October 1999 until benefits were terminated two years later.  It is also undisputed that during those two years, Aetna failed to respond to Clarke's inquiry whether it would require updated medical statements, and failed to follow up on its interviewer's request for authorization, and failed to instruct Clarke to send them a mental health provider's statement, regardless of whether it would contain no new information.

Aetna vigorously argues that it did not waive the requirement for updated proof of loss by failing to answer Clarke's faxes.  It points the Court to Section V(H), which provides "[f]ailure to insist upon compliance with any policy provision of any given time(s) under any given set(s) of circumstances will not waive, modify nor render such provision unenforceable at any other time(s) it is applied, whether the circumstances are or are not the same."  (Mahajan Decl. Ex. 1 at 23)  Aetna is correct that it could insist upon strict compliance with this 90-day deadline, despite having chosen not to insist upon compliance previously.  *See Financial Techs. Int'l, Inc. v. Smith*, 247 F. Supp. 2d 397, 407 (S.D.N.Y. 2002) ("[W]here an agreement contains a no-waiver provision such as this one, a party's failure to insist upon strict compliance is not considered a waiver of his right to demand exact compliance [at a future date]." (internal quotation marks omitted)).  Aetna's failure to respond to Clarke's fax did not preclude it from demanding proof of loss, and threatening nonpayment of benefits should Clarke fail to comply.

However, there is a genuine issue as to whether Aetna ever demanded compliance with Section VI(B).  In December 2000, the interviewer asked for an authorization so Aetna could obtain proof of loss directly, but did not follow up for ten months when he refused.  In the next communication on October 8, 2001, Aetna did attach a mental health

16

provider's statement. (TCC-68.) Clarke offered to send the form upon direct instruction. (Mahajan Decl. Ex. 13.) Seccombe explained his reaction: "[U]nless I instructed [Clarke], he was not going to go ahead and have a doctor complete that form." (Seccombe Tr. 70.) He continued that he chose not to so instruct Clarke because the statement would have been based on a ten-month old visit. (*Id.*) Be that as it may, Seccombe's failure to request Clarke to submit a form following Clarke's inquiry raises a genuine question of fact as to whether Clarke's actions in October of 2002 constituted a material breach of his obligations under the insurance policy, justifying Aetna's termination of his benefits.[5] Therefore, the Court rejects this ground as a basis for summary judgment.

### 3. Lack of Disability

While Aetna argues that it had multiple justifications for permanently terminating Clarke's benefits, its basic claim is that after Clarke recovered from his severe depressive episode, he could have returned to work and was no longer disabled. (Mot. 2–3; Reply 9–10.) Clarke has the ultimate burden of proving by a preponderance of evidence that he was continuously disabled within the meaning of the plan for the entire period for which he seeks to recover benefits. *See Paese v. Hartford Life Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006). However, at the summary judgment stage, Aetna must show that no genuine issue of material fact exists as to whether Clarke was disabled at the time it terminated his benefits. This Aetna cannot do.

---

[5] Even if Clarke's failure to submit a statement in response to the October 8, 2001 letter was a material breach, such a breach would not justify the permanent termination of Clarke's benefits two weeks later. Under the terms of the policy, if a claimant "does not send Aetna the form when due, Aetna will still honor the claim if he or she sends Aetna the form as soon as reasonably possible. The form must be sent to Aetna not later than one year after it is otherwise required." (Mahajan Decl. Ex. 1 at 27.) Thus, Aetna was not clearly justified in terminating Clarke's benefits until one year after demand for proof of loss was made, October 8, 2002.

Clarke was disabled, and Aetna responsible for paying benefits, so long as he was totally or partially disabled as those terms are defined in the policy. Both parties draw the Court's attention only to those pieces of evidence that support their position on the nature, extent, and duration of Clarke's disability. For example, Aetna refers the Court to a letter from Dr. Khan in August 28, 1998 stating that he "would anticipate that [Clarke] will be able to return to work, eventually fulltime. . . . . Mr. Clarke may well be able to work normally in a matter of weeks, [but] . . . it is not possible to be definite at this time." (Mahajan Decl. Ex. 21.) However, two months later Dr. Khan wrote that Clarke "remained very depressed" and almost eight months later, Dr. Khan stated in an Attending Physician's Statement submitted to Aetna that Clarke was "advised to avoid stress" and his "maximum medical improvement" was expected in three to six additional months. (TCC-79; TCC-97.) Aetna notes that Dr. Robertson predicted on June 22, 1999 that Clarke "should be able to resume full time work in 6 months" and noted that he was able to work part-time then. But after less than four months, Robertson wrote to Clarke that he "confirm[s] the advice given by Dr. Khan that you should in the future avoid the high levels of stress to which you were exposed while a partner in the law firm Garretts. . . . I regard the advice given above as affecting the rest of your working life up to retirement." (Mahajan Decl. Ex. 31.) Dr. White stated that Robertson's advice to Clarke not to return to a full-time high stress job was "well within what people would feel is appropriate." (*Id.* at 105.) Robertson also noted in February 2000 that Clarke had "wisely taken a precaution of arranging a couple of months off work." (Mahajan Decl. Ex. 35.) The preponderance of the evidence may ultimately weigh in Aetna's favor. Nonetheless, the Court cannot say that no reasonable factfinder could conclude that Clarke continued to be disabled through

18

termination of his benefits, in the sense that he could not return to a law firm and "perform all of the duties . . . on a full time basis" without serious risk of suffering a relapse and having another depressive episode. Therefore, the Court denies Aetna's motion for summary judgment based on Clarke's lack of disability.

## CONCLUSION

For the foregoing reasons, Aetna's motion for summary judgment [24] that it lawfully terminated Clarke's benefits is denied. First, noncompliance with the regular care requirement is only grounds for temporary nonpayment, not permanent termination, of disability benefits. Clarke is entitled to resumption of benefits upon proof that he resumed compliance with the requirement while still under the same disability. Second, there is a genuine issue as to whether Clarke's failure to submit proof of loss constituted a material breach of the policy, and whether such a breach is grounds for permanently terminating benefits two weeks later. Finally, there is a genuine issue as to whether Clarke was disabled when Aetna permanently terminated his benefits and whether he has continued to be disabled under the terms of the policy until the present.

SO ORDERED.

Dated: New York, New York
February 2, 2007

Richard J. Holwell
United States District Judge