UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                              :
TREVOR CHARLES CLARKE,                        :        04 Civ. 1440 (RJH)
                                              :
                    Plaintiff,                :
                                              :        **MEMORANDUM**
          - against -                         :        **OPINION AND ORDER**
                                              :
AETNA LIFE INSURANCE COMPANY,                 :
                                              :
                    Defendant.                :
                                              :
------------------------------------------------------------x

   This is an action brought by plaintiff Trevor Clarke against Aetna Life Insurance

Company ("Aetna") for breach of contract for failure to pay disability benefits to Plaintiff

pursuant to a long term disability policy issued by Aetna (the "Policy").

   This case was tried before the Court without a jury from April 1 to April 3, 2008.

This opinion sets forth the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52(a).  To the extent that any finding of fact reflects a

legal conclusion, it should be to that extent deemed a conclusion of law and vice versa.

For the reasons explained below, the Court finds that Clark has not proved, by a

preponderance of the evidence, that he was entitled to either total disability or partial

disability benefits under the Policy.


**FINDINGS OF FACT**

**Plaintiff's Occupation**

   1.  Trevor Clarke is a solicitor specializing in pensions law in the UK.  In 1994,

     Clarke helped to start Garrett's, a Leeds law firm financially backed by Arthur

Andersen ("Andersen").  Andersen, the largest professional services organization in the world, was seeking to establish multi-disciplinary partnerships throughout the world.

2.    Clarke joined Garrett's as a National Partner in May 1994.  At Garrett's, Clarke was guaranteed a "Capped Equity," which was a share of the firm's profits.  When he first joined Garrett's, his guaranteed profit share was about $240,000.  By 1998, this had increased to about $273,000.

3.    Prior to working at Garrett's, Clarke had worked at the law firms Edge Ellison and Simpson Curtis.

4.    Garrett's was a competitive environment.  Garrett's partners were expected to perform at a high level and to be "on call" to address work issues outside normal working hours, including weekends and holidays.  (Clarke Aff. ¶¶ 24, 32.)  At Garrett's, Clarke handled pension schemes of large corporate clients, drafted trust deeds for small self-administered pension schemes ("SSASs"), and acted as a Pensioner Trustee for these SSASs.  (Clarke Aff. ¶ 34.) Initially, Clarke had responsibility for all pensions work generated in the Leeds and London offices.  Later he moved to Birmingham and assumed responsibility for pensions work in England and Scotland.  He supervised three or four pension lawyers in Birmingham and assisted with other offices. Clarke also assisted regional offices in appointing their own pension lawyers.

As these offices' pensions practices developed, Clarke was responsible for replacing the work that had previously been referred from these offices with work for Birmingham clients.  (Clarke Aff. ¶¶ 23–35.)

5.      After a merger between Garrett's Employment Law and Pensions department and the Human Capital Services ("HCS") Department of Andersen, Clarke became the joint head of the HCS practice in the Midlands.  In this role, Clarke was asked to recruit for a new division within HCS that specialized in pensions and financial services as part of creating a new full-service pensions and investment services.  Clarke also had to recruit and supervise non-legal personnel for the HCS department.  In total, Clarke and one other partner were responsible for a group of approximately forty individuals.  (Clarke Aff. ¶¶ 26–35.)

6.      Andersen set an annual target for the increase in the number of qualified staff working under each partner.  Clarke was required not only to increase the number of qualified staff working for him but also to find enough client work to occupy all of these individuals.  (Clarke Aff. ¶¶ 30–32.)

7.      Clarke's occupation was that of a senior partner in a large law and accounting firm in Birmingham, England.  The material duties of Clarke's occupation were to oversee Garrett's pension work in England and Scotland, to practice pensions law, to be "on call" outside of regular working hours, to recruit

personnel for the HCS division, to supervise legal and non-legal personnel, and to maintain client relationships and obtain new clients.

**The Policy**

8.  As a partner at Garrett's, Clarke was covered by Long-Term Disability Policy No. LTD-299098 ("the Policy"), issued by Aetna.

9.  The parties have provided competing versions of the Policy as trial exhibits; there is a dispute over which version governs Clarke's 2001 claim for disability benefits under the Policy.  (Aetna Ex. 1; Clarke Ex. 2.)  Clarke notes that his version is labeled with the code "94BERM," while Aetna's version is labeled "93BERM."  In addition, Clarke provides an August 3, 1999 letter from Aetna to Clarke indicating that total disability benefits are paid at a rate of 70% of monthly basic earnings until age 62.  (Clarke Ex. 4 at 5–7.)  This is consistent with the total disability benefits described in the 94BERM policy offered by Clarke (Clarke Ex. 2 at 4, 5, 7, 26), but not the 93BERM policy offered by Aetna (Aetna Ex. 1 at 6, 8, 31.).  Aetna has offered no argument or evidence on this issue.  The Court finds that Clarke's claim for disability benefits is governed by the version of the Policy designated 94BERM (Clarke Ex. 2).

10.  The relevant provisions of the Policy are as follows:

II.A.2.  An individual will remain eligible [for Long-Term Disability Coverage] as long as he or she:

a.  Continues to be an active partner; or

b.      Is a retired partner under age 62 (only for total disability benefits).

VII.3.      Actively Employed or Active Employment for partners means:

a.      Devoting all professional time, skill and attention to the affairs of the Policyholder; and

b.      Not being:

(1)      Hospital confined;

(2)      Confined in any institution/facility other than a hospital due to an injury or sickness; or

(3)      Confined at home and under the supervision of a physician.

II.D.2.      If a covered individual is eligible because of employment, he or she will no longer be eligible when the covered individual:

a.      Resigns; . . .

c.      Is dismissed, disabled or suspended;

d.      Is no longer in an eligible class;

e.      Does not satisfy the requirements for hours worked or any other eligibility provisions.

VII.33.      Total Disability/Totally Disabled for LTD means: . . .

b.      For Active Regular Partners or for Retired Partners disabled while active that solely because of an illness, pregnancy or accidental bodily injury, an insured partner is unable:  (1) To perform each of the material duties of the partner's regular occupation on a full-time basis; . . . .

c.      For Retired Partners disabled after retirement that solely because of an illness, pregnancy or accidental bodily injury, an insured partner is unable . . . to perform independently the functions needed for the basic Activities of Daily

Living:  (a) Bathing; (b) Dressing; (c) Feeding; (d)
Continence; (e) Toileting; (f) Transferring (getting in and
out of a chair, bed, toilet, etc.) . . .

III.B.1.   If, while insured under this provision, a covered individual
becomes Totally Disabled, Aetna will pay [Total Disability
benefits].

Benefits will begin [after a one-year waiting period] ends.

Benefits will be payable for a period of Total Disability until the
earliest of:

a.      [Age 62]

b.      The day the covered individual is no longer Totally
Disabled; or

c.      The day of the covered individual's death.

VII.21.b.   Partial Disability or Partially Disabled for an active partner means
that an active partner returns to work, but cannot fully perform the
duties of his or her regular occupation solely because of an illness,
pregnancy, or accidental bodily injury, but:

(1)      is able to perform one or more, but not all of the material
and substantial duties of his or her own occupation on a
full-time or part-time basis; or

(2)      is earning less than 80% of Pre-disability Income at the
time partial disability employment begins.

III.C.1.   If an active partner has been released for part-time work by his or
her physicians, but is unable with diligent effort to find work
which meets the Partial Disability requirements, Partial Disability
benefits may be paid with approval of Aetna Life.

III.C.2.   [Partial Disability] [b]enefits will be payable until the earliest of:

a.  [Age 62] (*see* Clarke Ex. 2 VII.11.)

b.  The day the partner is no longer Partially Disabled;

c.  The day the active partner retires;

d.  The day of the covered individual's death;

e.  The first day following the month in which current monthly earnings exceed 80% of the Basic Monthly Earnings prior to disability.

VI.A.  Before Benefits are paid, Aetna must be given a written proof of loss.

VI.A–C.  [A Proof of Loss form must be completed by the claimant and a physician and submitted to Aetna] at least once each ninety days as long as the covered individual is disabled.  If he or she does not send Aetna the form when due, Aetna will still honor the claim if he or she sends Aetna the form as soon as reasonably possible. The form must be sent to Aetna not later than one year after it is otherwise required (unless the claimant is not legally capable).

III.D.  Aetna will not pay for any disability . . . during which a covered individual is not under the regular care and attendance of a physician; [or] . . . which begins while the covered individual is not insured under the Policy.

III.D.8.  Partial Disability Benefits will not be paid to retired partners.

**Onset of Plaintiff's Condition**

11.  Around late October 1997, Clarke's fiancée, Gay Nebel, noticed that Clarke was acting strangely, was having trouble sleeping, and was drinking more than usual.  (Nebel Aff. ¶¶ 18–20.)

7

12.     Around January 1998, in addition to the pressures of his job, Clarke had

        clashed with other Andersen partners and had been named in a claim for legal

        negligence.  Around the same time, he discovered that Nebel was having an

        affair.  (*See* Clarke Aff. ¶ 46)

13.     In early 1998, Clarke became increasingly anxious and paranoid, and became

        preoccupied with the possibility that he had made mistakes in his work.  He

        started to believe that he was being monitored by Andersen and/or the police

        and that his conversations were being recorded.  Clarke continued to drink

        heavily.  He engaged in erratic driving and bizarre behavior.

14.     At some point during this 1998 episode, Clarke contemplated suicide and took

        some steps towards a suicide attempt.  He gathered all of the over-the-counter

        drugs in the house so he could use them "if things got too bad."  (Clarke Aff.

        ¶ 63.)  Clarke became aggressive when Nebel attempted to remove the pills.

15.     In April 1998, Clarke's general practitioner Dr. Hyde threatened to have

        Clarke forcibly admitted to a psychiatric hospital, and Clarke agreed to

        receive outpatient treatment.  He was prescribed medication at this time, and,

        at Dr. Hyde's suggestion, began consulting with psychiatrists at

        Kidderminster General Hospital.  (Clarke Ex. 6 at 195–213.)  Clarke reported

        to one of these psychiatrists, Dr. Simon Smith, that both his mother and

brother had been treated for depression.  (Clarke Ex. 6 at 201; *see also* Clarke Aff. ¶¶ 53–56.)

16.     Due to his depressive state, Clarke stopped going to work around April 1998. For some months, Clarke became very isolated and drank heavily.  He reports being very agitated and having trouble concentrating and getting to sleep.  He stayed indoors most days and did not maintain personal hygiene.  At some point, he became lethargic and stayed in bed all day and night.  (Clarke Aff. ¶ 61.)

17.     During the summer of 1998, Clarke had discussions with Garrett's about returning to work.  Though he was not fully recovered, Clarke was interested in returning to work, at least on a part-time basis.  Clarke told Paul Finlan, the managing partner in Birmingham, that his doctors had told him it took an average of ten months for recovery from a bout of severe clinical depression without treatment.  Clarke said that since he was being treated and had already begun his recovery, he might be able to return to work in "a matter of months."

18.     On July 21, 1998, Clarke was informed by Paul Finlan that Garrett's was going to recruit a senior pensions lawyer.  The next day, Clarke asked Dr. Khan to write him a letter in support of not returning to work at that time.  (Tr. 34–37.)  Dr. Khan wrote Clarke a letter dated July 24, 1998, stating that

Clarke was progressing in his recovery but that it would be "some months" before Clarke was fully recovered and able to return to full-time work.

19.   On July 30, 1998, Clarke was informed that he would not be permitted to return to Garrett's as the leader of the pensions practice. (Aetna Ex. 3.) At this time, Clarke was told that he would be allowed to return to work on a part-time basis as long as he saw a psychiatrist. (Clarke Aff. ¶¶ 86–93; Aetna Ex. 3.) In August, Clarke was told that if he did not return to work by the end of September, he would be asked to resign. (Clarke Aff. ¶ 90.)

20.   In August 1998, Clarke asked Dr. Khan for a letter supporting his return to work. (Tr. 38.) On August 20, 1998, Dr. Khan wrote a letter to Sukki Kaur, HR manager at Andersen, stating "I would anticipate that [Clarke] will be able to return to work, eventually full-time. . . . I do not believe that he is presently well enough for this, though may now be well enough to undertake part-time duties." (Clarke Ex. 6 at 218.)

21.   On September 16, 1998, Dr. Khan wrote to Sukki Kaur that Clarke was "making very good progress in recovery from his depression." (Clarke Ex. 6 at 222.) However, Clarke was told in late September that, due to his medical condition, he would not be permitted to return. (Clarke Aff. ¶¶ 94–96.)

22.     Garrett's encouraged Clarke to retire, telling him that he would receive a

three-month severance pay if he did so.  He was later told that if he did not

retire, the firm would remove him from the partnership pursuant to their

powers under the partnership agreement.  Because Clarke did not want a

removal on his record, he agreed to leave Garrett's in late September 1998.

(Clarke Aff ¶ 98.)

23.     After his resignation from Garrett's, Clarke's depression worsened.  He

remained in bed, drank, and neglected his personal hygiene.  He stored away a

supply of acetaminophen, which he considered an "escape route . . . if things

got too bad."  (Clarke Aff. ¶ 103.)

24.     Clarke first saw psychiatrist Dr. James Robertson at Kidderminster General

Hospital on December 7 1998; Dr. Robertson immediately admitted Clarke as

an inpatient.  Clarke was hospitalized at Kidderminster for most of December

1998.  During this time, he was medicated with various drugs.

25.     After his release from Kidderminster on December 30, 1998, Clarke was

prescribed lithium, sertraline (Lustral), and nitrazepam.  (Clarke Ex. 6 at 235.)

26.     Between January 1, 1999 and January 1, 2002, Dr. Robertson saw Clarke only

two or three times.  (Tr. 360.)

27.     Sometime around early March 1999, Clarke stopped taking his medication after he ran out of pills.  He decided not to resume his medication despite advice from doctors to continue taking Lithium.  (Clarke Ex. 6 at 237.)

28.     In a March 9, 1999 letter to George Campion at Andersen, Clarke stated that he was "more or less back to normal" and "now mentally capable of returning to my old job."  (Aetna Ex. 6.)  He noted, however, that he "should consider the wisdom of so doing" in light of Dr. Khan's advice that because of Clarke's protracted recovery and the severity of his illness, "exposure to high levels of pressure and stress make a recurrence more likely . . . although the decision would of course be mine."  (Aetna Ex. 6.)  Dr. Khan advised him that he had the mental capability to return to his job, but that there would be some risk of relapse from the stress associated with the work and that Dr. Khan did not recommend taking that risk.  (Tr. 100–02; Aetna Ex. 6.)

29.     On March 30, 1999, Clarke was involved in a car accident on his way to a job interview.  Clarke told Dr. Robertson he was very tired at the time, as he had lain awake worrying about the interview the previous night.  Dr. Robertson believes that Clarke's account indicates that he was suffering residual symptoms of anxiety resulting from his depressive episode.  (Robertson Aff. ¶¶ 41–42.)  At Dr. Robertson's recommendation, Clarke resumed taking sertraline after this accident.  (Robertson Aff. ¶ 43; *see also* Aetna Ex. 7 at AETNA 444; Clarke Ex. 6 at 246.)

30.     On June 1, 1999, Clarke began working part-time as a consultant for the law
        firm Martineau Johnson.  Clarke worked the equivalent of two days per week,
        though on occasion he worked through the night if the transaction required.

31.     During a June 23, 1999 visit with Clarke, Dr. Robertson observed no residual
        symptoms of depression or anxiety.  (Tr. 360, 362.)  Clarke reported feeling
        well and Dr. Robertson testified that he "seemed to be doing substantially
        better."  (Robertson Aff. ¶ 45.)

32.     Dr. Robertson opined in June 1999 that Clarke should be able to resume full-
        time work within six months.  At trial, Dr. Robertson claimed he was referring
        to full-time work at a job with less stress and pressure than Clarke's position
        at Garrett's.  The Court does not accept this explanation, noting its
        inconsistency with his deposition testimony on this point.  (*Compare*
        Robertson ¶ 54 *with* Aetna Ex. 45 at 110–11.)

33.     In an insurance claim form submitted to Aetna in August 1999, Clarke
        attached a letter in which Dr. Khan confirmed that he had advised Clarke to
        reduce his stress levels and not to return to a job like he had at Garrett's.
        (Clarke Aff. ¶ 135.)

34.     Aetna approved Clarke's claim for long-term disability benefits on August 3,

1999.  (Clarke Aff. ¶¶ 134–36.)

35.     On October 6, 1999, Clarke provided Aetna with a Mental Health Provider's

Statement and letter from Dr. Robertson advising Clarke to "avoid the high

levels of stress to which [he] was exposed while a partner in the law firm

Garretts."  Dr. Robertson further stated that "[i]gnoring this advice will

increase the risk of a relapse into severe clinical depression with the

associated suicide risks you experienced in December 1998."  Dr. Robertson

wrote that his advice applied for the remainder of Clarke's working life until

retirement and that he considered Clarke to be "permanently disabled from

returning to [his] Garretts job or one like it." (Clarke Aff. ¶ 137.)  Clarke had

provided Dr. Robertson with a suggested draft of this letter.  (Tr. 371–72;

Aetna Ex. 17.)

36.     Dr. Robertson has testified that he did not know what Clarke's day-to-day job

responsibilities were when he declared Clarke to be "permanently disabled."

He explained, however, that he believes it is the stress of the job, not the

particular duties, that is important.

37.     Dr. Robertson's records do not include a written note reflecting an

examination of Clarke near the time of the October 1999 letter.  (Tr. 398–99.)

However, a letter from Clarke dated October 1, 1999 states that an

appointment with Dr. Robertson was scheduled for October 6, 1999.  (Tr. 397–98.)  Dr. Robertson does not remember whether he met with Clarke prior to filling out the form or not.  (Tr. 397–99.)  He testified that it was not his practice to fill out an insurance form without a recent examination of a patient, but that he might do so if he were sure that there had been no significant clinical change since the last examination.  (Tr. 398.)

38.   In the October 1999 letter, Dr. Robertson diagnosed Clarke as having suffered a single depressive episode.  (Tr. 388–91.)  Dr. Robertson did not indicate that Clarke had not fully recovered, and did not indicate that Clarke's condition was chronic.  (Tr. 391.)  He also did not code Clarke's condition using a longitudinal course specifier, *i.e.* "with full interepisode recovery" or "without full interepisode recovery."  (Tr. 273, 275, 390–92.)

39.   In October 1999, Dr. Robertson assessed Clarke with a rating of 80 on the Global Assessment of Functioning ("GAF") scale.  According to the DSM-IV, this score means, "If symptoms are present they are transient and expectable reactions to psychosocial stressors, *e.g.*, difficulty concentrating after a family argument, no more than slight impairment in social occupational or school functioning."  (Tr. 374; Aetna Ex. 18 at AETNA 337.)

40.   Beginning in the fall of 1999, Clarke was involved in a dispute with Andersen regarding his disability benefits.  This dispute continued until Clarke and

Andersen reached a settlement in April 2001.  This dispute was a source of additional stress and anxiety for Clarke.

41.     Dr. Robertson last saw Clarke on February 11, 2000.  (Tr. 361.)  Dr. Robertson states that Clarke showed no clinical features of depression during this visit though he reported worry about a number of situational stressors, including working "up to the limit," working "all night at times," his involvement in litigations, his daughter's dyslexia, and a dental abscess.  (Tr. 364; Clarke Ex. 6 at 78.)  Dr. Robertson, who was about to retire, recommended that Clarke be continued on medication and referred him to another psychiatrist.  (Clarke Ex. 6 at 78.)

42.     In February 2000, Clarke felt that his "stress level was approaching levels that seemed dangerous again" and took a two-month medical sabbatical from his firm, Martineau Johnson, (Clarke Aff. ¶ 129), based on the advice of Dr. Robertson, who expressed concern that exposure to too much stress would put Clarke at risk of a relapse.  (Robertson Aff. ¶ 52.)  Clarke attributed his stress level to the work he was doing for Martineau Johnson as well as an ongoing dispute with Andersen regarding his disability benefits.  (Tr. 108.)

43.     At some point during 2000, Clarke proposed setting up a help line on which Martineau Johnson employees could call him at any time with questions, on

the condition that the cumulative hours could not exceed sixteen hours per week.  (Tr. 69–70.)

44.     Since leaving Garrett's, Clarke has also done consulting on an ad hoc basis for other firms, including Kent Jones (Tr. 174–75), Wright Hassall, Bridgehouse Partners, and Shakespeare's, and has started his own private pension law practice, which he runs out of his home.

45.     Clarke's home practice has expanded as Clarke has started to reestablish himself in the pension law marketplace following his medical problems.  As part of his private practice, Clarke has hired litigation consultants.

46.     Upon Dr. Robertson's retirement he discharged Clarke to the care of his family physician, Dr. Hyde.  Dr. Hyde's medical records indicate that, as of May 12, 2000, Clarke had been off his medication for two months and preferred not to resume medication.  (Clarke Ex. 6 at 35.)  Clarke indicated at that time that he "feels absolutely fine," "sleeps well," and "no longer wants to be partner in firm."  (Clarke Ex. 6 at 35.)

47.     In an interview with an investigator on December 12, 2000, Clarke reported that he had been taking lithium until February 2000 when he went abroad and forgot to take his tablets.  Upon returning, he went off lithium (with Dr.

Hyde's approval), and had not felt the need to go back on medication since. (Aetna Ex. 25.)

48.     On October 8, 2001, Robert Seccombe of Aetna sent Clarke a request for updated medical information in order to evaluate Clarke's disability claim. (Aetna Ex. 30.)  Clarke responded the next day, reporting that he was not taking medication and had not needed to see Dr. Hyde since at least January 1, 2001.  (Aetna Ex. 31.)

49.     On October 24, 2001, Aetna notified Clarke that his benefits were being terminated because Clarke was not "under the regular care and attendance of a physician as required by [the Policy]," and because Aetna had "received no medical information to substantiate that [Clarke] remained totally disabled as defined under [the Policy]."  (Aetna Ex. 32.)

50.     Following the termination, Clarke appealed Aetna's discontinuation of his benefits.  (Clarke Aff. ¶ 157.)  Clarke attempted to prepare his appeal without the assistance of a lawyer, though he consulted with friends for advice. (Clarke Aff. ¶¶ 159–62.)

51.     Clarke has been involved in several other disputes since his 1998 depressive episode, for example, a 2000 dispute regarding a refund of tuition for a ski instructor course, (Clarke Aff. ¶ 171), a 2000 dispute against Martineau

Johnson for errors made in connection with an apartment Clarke purchased in the French Alps (Clarke Aff. ¶ 172), a litigation/mediation with a builder regarding disputed charges for renovations to Clarke's home, (Clarke Aff. ¶ 174), and a dispute with Andersen regarding his rights under their disability scheme.  (Clarke Aff. ¶ 100, 175.)

52.     A November 27, 2001 letter from Dr. Hyde to Aetna indicated that Clarke had been "disturbed" by the termination of benefits and was suffering from "early morning waking and lack of concentration."  Dr. Hyde also stated that he had advised Clarke to avoid stress.  (Clarke Aff. ¶ 162; Aetna Ex. 33 at AETNA 170.)  This letter was drafted by Clarke.  (Tr. 116–20.)  The letter further stated "My patient has been one hundred percent compliant with the medical advice given by Dr. Robertson."  (Tr. 116–19; Aetna Ex. 33 at AETNA 171.)

53.     Dr. Hyde was the only physician treating Clarke in October 2001.  There is no mention of depression or anxiety in Dr. Hyde's records from October or November 2001.  For example, the entry for November 15, 2001 states "mood fine."  (Tr. 367–68.)

54.     Dr. Hyde prescribed medication at some time after the termination of Clarke's benefits.  (Clarke Aff. ¶ 162.)  Dr. Hyde's records indicate that diazepam was prescribed for Clarke on November 6, 2001.  (Clarke Ex. 6 at 34.)

55.     Clarke did not see a psychiatrist between February 2000 and February 2002.

        (Tr. 238.)  However, after Clarke's appeal was denied on February 26, 2002,

        Dr. Hyde's office referred Clarke to a specialist psychiatrist, Dr. Alfred

        White.

56.     In a March 25, 2002 letter to Aetna, Clarke stated that he had last taken

        medication in March 1999.  (Clarke Aff. ¶ 165.)  On this same date, Dr. Hyde

        restarted Clarke on the antidepressant sertraline (Lustral).  (Clarke Ex. 6 at 32;

        Clarke Aff. ¶ 166.)

57.     Dr. White first saw Clarke on April 8, 2002.  (Tr. 279.)  During this

        consultation, Dr. White found Clarke to be "severely agitated" and "very ill"

        and noted that he was "obsessed with the intricacies of his inability to obtain

        his pension." (Tr. 286; Aetna Ex. 48.)  Dr. White wrote a letter to Aetna after

        his first consultation with Clarke.  (Tr. 286–87.)  He explained that he wrote

        this letter because he believed helping Clarke with his disability claim was an

        important component of his treatment.  (Tr. 287.)  Dr. White testified that he

        wrote to Aetna to try and get rid of one of the contributing factors to Clarke's

        illness.  (Tr. 303.)

58.     Dr. White testified that he thought Clarke's worries about his finances were

        relevant to his condition.  (Tr. 287.)  He said he believed Clarke's relapse was

"related to his problems relating to his insurance and how he perceived these problems were being handled."  (Tr. 292.)

59.     Dr. White testified at trial that he was concerned that Clarke was a risk to himself when he met with him on April 8, 2002; however, he did not note this opinion in his April 15, 2002 letter to Dr. D.S. Richards (a member of Dr. Hyde's practice).  (Tr. 289; Clarke Ex. 6 at 187-88.)  Dr. Richards wrote in his April 8, 2002 letter referring Clarke to Dr. White that Clarke "certainly . . . does not appear to be suicidal." (Tr. 335.)

60.     Dr. White admitted Clarke to Kidderminster hospital as an inpatient after the April 8, 2002 consultation.  (White Aff. ¶ 18.)  Clarke was restarted on lithium on this date.  (Clarke Ex. 6 at 194.)  Dr. White testified that Clarke responded fairly quickly to medication during his hospitalization in April 2002.  (Tr. 299, 305, 313.)  Dr. White did not believe Clark to be a risk to himself after his discharge from the hospital on April 16, 2002.  (Tr. 336.)

61.     Clarke testified that his April 2002 hospitalization was related to his increased alcohol consumption as well as Aetna's denial of his disability benefits and his appeal.  (Tr. 123–25.)

62.     During his hospitalization, Dr. White and Clarke discussed and exchanged
        drafts of a letter to be sent by Dr. White to Aetna regarding Clarke's disability
        benefits.  (Tr. 299-304; Aetna Ex. 50.)

63.     After the April 16, 2002 discharge, Dr. White next saw Clarke on June 20,
        2002.  (Tr. 314-15.)  Dr. White wrote to Dr. Hyde on this date to report that
        Clarke was "fully well and . . . obviously recovered from his recent relapse."
        (Aetna Ex. 38.)

64.     Since June 2002, Dr. White has seen Clarke approximately every six months.
        (White Aff. ¶ 25; Tr. 122–23.)  Dr. White informed him that this frequency
        was appropriate because "your disability is all related to risk of relapse and
        not to ongoing day-to-day symptoms that require medication."  (Tr. 123.)
        Clarke's medical records since this time note occasional reports suggesting
        depression or anxiety, for example, "low" mood, difficulty sleeping, and
        difficulty concentrating, but have on other occasions indicated that Clarke is,
        for example, "in fine spirits," "keeping entirely well," and "feels fine."

65.     Dr. Robertson testified that he believes Clarke has not been acutely
        symptomatic since 2002.  (Robertson Aff. ¶ 68.)  Similarly, Dr. White
        testified at his deposition in June 2005 that Clarke had not been depressed
        since April 2002.  (Aetna Ex. 46 at 89–90.)

66.     Dr. White advised Clarke in 2003 to avoid "highly stressful work, which has
        the danger of increased anxiety, sleep disturbance and possibly a further
        depressive bout."  (White Aff. ¶ 32.)

67.     In September 2004 and on several occasions since, Dr. White has noted in
        letters to Dr. Hyde that his ongoing litigation against Aetna is a considerable
        source of stress for Clarke.  In September 2005, after a settlement conference
        in this litigation, Clarke reported hearing buzzing and singing noises in his
        head and having difficulty sleeping.  (White Aff. ¶ 45.)

68.     Dr. White's medical records indicate that Clarke was on various medications
        during 2005 and 2006, including lithium, carbamazepine, and mirtazapine.
        (Clarke Ex. 7 at 7–19.)  Clarke stopped taking lithium in November 2005
        because he was gaining weight.  (Clarke Ex. 7 at 16.)  On July 7, 2006, Dr.
        White reported that he and Clarke had agreed that Clarke would not receive
        any prophylactic medication.  (Clarke Ex. 7 at 19.)  Dr. White remained of
        this opinion in October 2006, when he stated that he preferred to treat Clarke
        only in the event of an acute episode, rather than prophylactically.  (Clarke
        Ex. 7 at 20.)  Clarke remained off medication as of October 2007 (Clarke Ex.
        7 at 26.)

**Physician Testimony**

**Dr. James Robertson:**

69.    In an October 1999 letter, Dr. Robertson advised Clarke that he "should in the

future avoid the high levels of stress to which [he was] exposed while a

partner in the law firm Garrett's," and that "[i]gnoring this advice will

increase the risk of a relapse into severe clinical depression with the

associated suicide risks [he] experienced in December 1998."


70.    Consistent with this advice, Dr. Robertson testified at trial that Clarke has "an

extreme vulnerability to stress, which he should avoid at the risk of further

depressive episodes."  According to Dr. Robertson, Clarke suffers from a

"latent, chronic depressive illness," (Robertson Aff. ¶ 19), that Dr. Robertson

labeled a "persistent, long-lasting, vulnerability to depressive illness."


71.    Dr. Robertson believes Clarke's vulnerability to stress is evidenced by

Clarke's car accident in March 1999, which resulted from fatigue due to

Clarke's excessive worry about a job interview the previous night, his need to

take a sabbatical from his part-time work at Martineau Johnson in February

2000, and by his relapse in April 2002 following Aetna's termination of his

disability benefits and denial of his appeal.  (Robertson Aff. ¶¶ 41–42, 62.)


72.    Dr. Robertson opined that Clarke is at an increased risk of relapse relative to

other patients because of the severity of his 1998 depressive episode, the

presence of psychotic symptoms and suicidal thoughts during that episode, the long time it took for him to respond to treatment, the existence of residual symptoms following that episode, and Clarke's "strong family history" of depression.  (Tr. 397, 401; Robertson Aff. ¶ 61.)  Furthermore, Dr. Robertson noted that each depressive episode increases the risk of relapse, and that Clarke has suffered at least one additional depressive episode since his initial episode in 1998.  (Robertson Aff. ¶¶ 16–18; Tr. 399–400.)

73.     Finally, in Dr. Robertson's opinion, "[n]o amount of care, whether medication, outpatient visits or hospitalization will enable [Clarke] to return to his job at Garrett's or one like it."  (Robertson Aff. ¶ 70; *see also* Robertson Aff. ¶ 79.)  He does not believe that Clarke "could manage at such a "demanding, high level, stressful position again." (Robertson Aff. ¶ 55.)

**Dr. Alfred White:**

74.     Dr. White testified that Clarke has a "latent, chronic, depressive illness," which he further characterized as a "chronic vulnerability to depression."  (Tr. 342.)  According to Dr. White, Clarke has been "continuously disabled and at risk of relapse from 1998" onward, (White Aff. ¶ 20), and Clarke's April 2002 relapse was "part of the same disabling depression from which Mr. Clarke has suffered since 1998."

75.     Based on his observations, Dr. White believes that stress is Clarke's primary vulnerability, or "trigger," with respect to relapse.  Dr. White believes

Clarke's "particularly high vulnerability to stress" is evidenced by his March 1999 car accident, his need to take a sabbatical from Martineau Johnson in 2000, his second inpatient hospitalization in 2002, (White Aff. ¶ 35), the fact that Clarke suffered "psychotic, paranoid delusions" in 1998, (White Aff. ¶ 36), and "residual symptoms," as evidenced by the fact that, at various times, the litigation aroused stress, anxiety, and/or agitation in Clarke.  (White Aff. ¶¶ 39–51, 56.)

76.    Dr. White agrees with Dr. Robertson that Clarke should avoid stress and should not return to work similar to that which Clarke performed at Garrett's, (White Aff. ¶ 30), and in fact gave Clarke similar advice in 2003.  (White Aff. ¶ 32).  Dr. White further testified that a "reasonable body of psychiatrists" would have given Clarke this same advice in October 1999.  In support of this advice, Dr. White stated that most of the attorneys he has treated for depressive illness have either not returned to full-time practice or have returned to less stressful legal work.  (White Aff. ¶ 34.)

77.    Dr. White stated that Clarke "always has a potential for relapse."  (White Aff. ¶ 13.)  Dr. White believes "with a reasonable degree of medical certainty that no amount of care," including medication, outpatient visits, psychotherapy, medical monitoring or hospitalization, "will enable him to return to his job at Garrett's or one like it."  (White Aff. ¶¶ 56–58.)  Rather, Clarke's "extreme vulnerability to stress" is permanent.  (White Aff. ¶ 56.)

78.     Dr. White stated that Clarke could do some work as an attorney on a full-time basis, but could not return to his job at Garrett's.  (Tr. 346–47, 349.)  Dr. White believes Clarke could not return to this job both because it could trigger a relapse and because, in light of the delusions that characterized Clarke's 1998 depressive episode, it would be risky for the employer.  (Tr. 347, 349.)

79.     Dr. White testified that, generally, a patient like Clarke, who is not acutely depressed, need only be seen by a psychiatrist every three to six months.  (White ¶ 24; Tr. 316.)

**Dr. Norman Weiss**

80.     Dr. Weiss was not one of Clarke's treating physicians.  Dr. Weiss's opinion was based upon his review of Clarke's medical records and a meeting with Clarke in September 2005.  (Weiss ¶¶ 7, 9.)

81.     According to Dr. Weiss, Clarke has a "latent, chronic depressive illness," one which is ongoing but which most of the time does not involve acute symptoms.  (Weiss Aff. ¶ 9.)  The "key feature" of Clarke's illness is a "substantial vulnerability to stress," evidenced by the fact that both of Clarke's hospitalizations coincided with periods of "extreme stress," by Clarke's February 2000 sabbatical from part-time work, and by Clarke's March 30, 1999 car accident.  (Weiss Aff. ¶¶ 12, 16.)  According to Dr.

Weiss, levels of stress that most people would be able to tolerate are capable
of inducing a relapse in Clarke.  (Weiss Aff. ¶ 12.)

82.   Dr. Weiss further characterized Clarke's disability as "his high risk for relapse
into a severe depressive condition," which he says has existed continuously
since 1998 and which increased after his 2002 relapse.  (Weiss Aff. ¶ 19.)  Dr.
Weiss testified that the severity of Clarke's initial depressive episode
increased the likelihood of future relapses and that Clarke still suffers from a
major depressive disorder in partial remission.  (Tr. 274–75.)  Dr. Weiss
testified that Clarke suffered such a relapse in October and November of
2001.  (Tr. 238.)

83.   Finally, Dr. Weiss also testified that Clarke has suffered from low level
symptoms of depression, anxiety, and/or cognitive impairment since 1998,
(Tr. 213–14), noting what he characterized as "frequent references" in
Clarke's medical records to residual symptoms of depression.  (Tr. 212–23;
*see also* Weiss ¶ 17.)

84.   Dr. Weiss testified that he believes "with a reasonable degree of medical
certainty" that Clarke's condition is permanent—that no amount of treatment,
hospitalization, medication, psychotherapy, or monitoring will enable him to
return to his job at Garrett's or one like it.  (Weiss Aff. ¶¶ 26, 30.)  Dr. Weiss
testified that Clarke's response to stress is "so extreme" that while

28

psychotherapy and medication might help him in some ways, they will not

protect him from a serious relapse.  (Tr. 258–59.)

85.      Based on his "general experience with depressed patients as well as [his]

familiarity with Mr. Clarke and his general circumstances," Dr. Weiss agreed

"unequivocally" with Dr. Robertson's opinion that Clarke should avoid stress

and should not return to work similar to his job at Garrett's.  (Weiss Aff.

¶ 20.)  Dr. Weiss testified that Clarke's "proven vulnerability to stress"

renders him "permanently disabled from returning to his job at Garrett's or

one like it."  (Weiss Aff.  14.)  Dr. Weiss believes that Clarke could possibly

work full-time as an attorney, depending on the nature of the work, but could

not be a supervisor, or have the responsibilities of a partner in a law firm, or

work in a position with a lot of stress or pressure.  (Tr. 249–50.)

## Dr. Seymour Block

86.      Dr. Seymour Block is a board-certified psychiatrist with over thirty years of

experience in psychiatry and extensive experience with depressed patients.

(Block Aff. ¶¶ 1–5.)

87.      Dr. Block never met or examined Clarke, but based his opinion on the

documents produced by Clarke in this litigation and on Aetna's claim file.  Dr.

Block also attended the deposition of Dr. Weiss and reviewed the deposition

transcripts of Dr. White and Dr. Robertson.  (Block Aff. ¶ 23.)

88.     In Dr. Block's opinion, Clarke is not "forevermore disabled" as a result of having one major depressive episode.  (Block Aff. ¶¶ 24–25.)  Based on his experience, Dr. Block estimated that approximately 80% of people with depression will successfully respond to treatment.  (Tr. 485; Block Aff. ¶ 22.)

89.     Dr. Block believes that Clarke's 1998 depressive episode did not come "out of the blue," but was precipitated by several significant psychosocial stressors that occurred around this time, for example, Ms. Nebel's affair, a malpractice suit, difficulties with other Garrett's partners, and the loss of his job at Garrett's.  (Block Aff. ¶¶ 28, 69.)

90.     Dr. Block also opined that Clarke "demonstrated a rapid and successful response to medication management."  (Block Aff. ¶ 29.)  Dr. Block based this opinion on evidence including the following:

- Clarke began taking Lustral around the time of the onset of his first depressive episode in April 1998.  Clarke's condition then improved from April to June of 1998.  (Block Aff. ¶¶ 29–34.)

- Around July, Clarke's condition worsened, and Dr. Smith discovered that Clarke had discontinued his medication.  (Block Aff. ¶¶ 35–36.)  Clarke began taking Lustral again, and, shortly thereafter, his condition improved.  (Block Aff. ¶¶ 36–39.)

- In August 1998, Dr. Khan attributed Clarke's decrease in anxiety to the antidepressant medication.  (Block Aff. ¶ 39.)  At some point, Dr. Khan also wrote in a letter to Garrett's that Clarke's full recovery would require continued use of antidepressant medication.  (Block Aff. ¶ 39.)

- After losing his job in October 1998, Clarke was switched from Lustral to nefazodone, and his condition deteriorated.  (Block Aff. ¶ 41.)  However, in November 1998, Clarke restarted Lustral, and in December 1998, began taking lithium.  By early January, after his hospitalization, Clarke showed considerable improvement.  (Block Aff. ¶¶ 42–45.)

- Clarke had discontinued his medication again by March 10, 1999.  (Block Aff. ¶ 45.)  After experiencing anxiety and being involved in a car accident, Clarke restarted his medication, and according to Dr. Robertson, "returned to health in late spring of [1999]."  (Block Aff. ¶ 46.)

- Against Dr. Robertson's advice, Clarke again discontinued his medication some time prior to March 6, 2000.  (Block Aff. ¶¶ 49–50.)  However, Dr. Hyde reported to Aetna that Clarke's condition was sufficiently stable in March 2000 that he decided not to refer Clarke to a new psychiatrist.  (Aetna Ex. 33 at AETNA172.)  In May 2000, Dr.

Hyde recorded that Clarke "feels absolutely fine." (Block Aff. ¶ 51; Clarke Ex. 6 at 31).

- In November 2001, Dr. Hyde reported to Aetna that he believed regular face-to-face meetings with Clarke to review his mental health were unnecessary and that he "ha[s] felt confident of Mr. Clarke's continued mental stability." (Block Aff. ¶ 50, Aetna Ex. 33 at AETNA174–175.)  Consistent with this report, Dr. Hyde found Clarke's "mood fine" during a November 15, 2001 appointment with Clarke.  (Block Aff. ¶ 51 n.3.)  Dr. Weiss testified at his deposition that there was no evidence in the medical records he reviewed that Clarke suffered any depressive symptoms between January 1999 and September 2001.  (Block Aff. ¶ 52; Aetna Ex. 47 at 83.)

91.   Dr. Block opines that there is no evidence that Clarke cannot perform his regular occupation, citing, *inter alia*, the fact that Clarke did perform his job for many years without mental health issues, (Block Aff. ¶ 72), the fact that he has worked as a consultant since leaving Garrett's, (Block Aff. ¶¶ 76–77), Dr. Weiss's deposition testimony that there is no evidence in the medical records that Clarke is unable to work forty hours per week as an attorney, (Block Aff. ¶ 75; Aetna Ex. 47 at 94), and the statements of Dr. White and Martineau Johnson indicating that Clarke had the intellectual capacity to perform legal work.  (Block Aff. ¶ 76; Clarke Ex. 6 at 118; Aetna Ex. 40.)

92.    The Court finds the credibility of Clarke's treating physicians to be
diminished significantly by their practice of submitting letters to Aetna drafted
by Clarke that purported to state the physician's independent medical
opinion.  The credibility of Dr. Robertson's October 1999 statement that
Clarke was "permanently disabled" for the remainder of his working life is
particularly suspect in light of his contemporaneous assignment to Clarke of a
GAF score of 80, corresponding to, *inter alia*, "no more than slight
impairment in social, occupational, or school functioning."  At a minimum,
this practice suggests that these opinions, both those submitted to Aetna and
reported at trial, were influenced heavily by Clarke's own assessments of his
condition and of his capabilities.

93.    The Court also notes that a treating physician's assessment regarding a
patient's recommended exposure to stress may apply a more cautious and
conservative standard than does a Court when determining whether that same
individual is entitled to disability benefits under an insurance policy.  The
physician typically seeks to minimize risks to the patient's health.  An insured
is not necessarily unable to return to work, however, simply because there is
some risk associated with the performance of the duties of his occupation.  As
another court in this circuit has noted, "a treating physician . . . has every
incentive—psychological, moral, and even, in view of the risk of malpractice
liability, financial—to take the most conservative possible view of [plaintiff's]
prognosis and treatment.  It would accordingly be entirely natural for him, in

doing his best to assure his patient's continued good health, to emphasize the risks facing the patient and to recommend the safest course possible." *Napoli v. First Unum Life Ins. Co.*, No. 99 Civ. 1329, 2005 WL 975873, at *4 (S.D.N.Y. April 22, 2005).

94.     Clarke has not demonstrated by a preponderance of the evidence that he is unable to return to his job at Garrett's or a similar position.

95.     Clarke has, since June 1999, worked successfully as an attorney, both as a consultant to a number of firms and as part of his private pension law practice, which he has successfully expanded.  Notably, this work has sometimes required him to work through the night.  Plaintiff's work experience suggests that he is not unable to practice pensions law, to maintain client relationships, or to obtain clients, all material duties of his regular occupation.

96.     Clarke himself testified at trial that no physician ever told him that he could not work full-time as an attorney, (Tr. 160), and Dr. Weiss testified at his deposition that Clarke could work forty hours per week as an attorney.  (Block Aff. ¶ 75; Aetna Ex. 47 at 94.)

97.     Clarke also has not shown by a preponderance of the evidence that he suffers from any residual cognitive deficits that would prevent him from performing

his regular occupation.  The evidence on this point is contradicted by considerable evidence to the contrary, for example:

- Dr. White's statement, which he reaffirmed at his deposition, that Clarke "remains fully capable intellectually of dealing with complex legal work," (Clarke Ex. 6 at 118; Aetna Ex. 46 at 162);

- Dr. Weiss's deposition testimony that he was aware of no evidence that Clarke suffered from depressive symptoms between January 1999 and September 2001, (Tr. 214–15), and between May 1, 2002 and September 8, 2005, (Tr. 221–22);

- Clarke's statement in March 1999 that he was "now mentally capable of returning to my old job," (Aetna Ex. 6 at A134);

- Dr. Robertson's testimony that Clarke has not been acutely symptomatic since 2002, (Robertson Aff. ¶ 68);

- Martineau Johnson's description of Clarke as a "meticulous and clever lawyer" and an "intellectual giant," who brought "much enthusiasm and energy to his work," (Aetna Ex. 40); and

- The fact that Clarke has successfully worked as an attorney since June 1999, including working long hours on occasion.

98.     Similarly, Clarke has not demonstrated by a preponderance of the evidence
        that he suffers from a persistent vulnerability to stress associated with the
        duties of his occupation, such that returning to his regular occupation would
        aggravate a serious condition affecting his health.

99.     The Court does not credit the opinions of Clarke's experts that Clarke suffers
        from an extreme vulnerability to stress that permanently prevents him from
        returning to his occupation, finding these opinions to be conclusory and not
        adequately supported by medical evidence or analysis.  In most cases,
        Clarke's experts provide little or no basis other than their own credentials, for
        their opinions.  For example:

        •   While all of Clarke's experts describe Clarke's condition as a "latent,
            chronic, depressive illness," Dr. Robertson admitted that this was not a
            recognized condition under the DSM-IV.  Dr. Robertson further
            admitted that "persistent, long-lasting, vulnerability to depressive
            relapse" was not a recognized condition under either the DSM-IV or
            the ICD.  (Tr. 385–86.)  Indeed, Clarke's experts offer no authority
            that recognizes the existence of his alleged condition—a depression
            that is essentially asymptomatic except for an extreme, untreatable,
            permanent vulnerability to stress;

        •   Dr. Weiss testified, in a conclusory fashion, that he based his opinion
            that Clarke should not return to a job similar to that he held at Garrett's

on Dr. Weiss's "general experience with depressed patients as well as [his] familiarity with Mr. Clarke and his general circumstances," (Weiss Aff. ¶ 20), but did not explain how his experience or Clarke's circumstances supported his opinion;

- Dr. Weiss testified that he could identify no published article to support his characterization of Clarke's depressive episode as unresolved despite the fact it had ended according to the DSM-IV criteria. (Tr. 228–30.) Instead, Dr. Weiss said that *he* was the medical authority supporting this statement, (Tr. 230.);

- Though Dr. White testified that most of the attorneys he has treated for depressive illness have either not returned to full-time practice or have returned to less stressful legal work, (White Aff. ¶ 34), he did not testify, nor does it follow from this observation, that these attorneys do so because they are unable to perform the duties of their previous occupations;

- Dr. Weiss testified that Clarke suffered a relapse in October and November 2001. However, the parties have stipulated that Clarke did not see a psychiatrist at any time during these months. (Tr. 238.) Furthermore, the records of Dr. Hyde indicate that Clarke did not visit Dr. Hyde between March 12, 2001 and November 6, 2001, (Tr. 240–41), and a November 15, 2001 entry from these records states "mood

fine."  (Tr. 242.)  Though confronted with these facts at trial, Dr.

Weiss did not adequately explain why these facts did not contradict his

opinion.

100.    All of Clarke's experts cited Clarke's March 1999 car accident as evidence of

Clarke's abnormal vulnerability to stress, presumably based on the conclusion

that the accident occurred because Clarke had not slept the previous night due

to anxiety about a job interview scheduled for the following day.  (*See, e.g.,*

Tr. 231–32.)  The Court rejects this conclusion as entirely speculative.

101.    First, the evidence reveals other, more plausible explanations for Clarke's

inability to sleep.  For example, Clarke had recently discontinued his

medication in March 1999.  (Tr. 235.)  Dr. Weiss stated at trial that he thought

it unlikely that this contributed to Clarke's anxiety, but provided no

convincing explanation for this belief.  (Tr. 235–36.)  In any event, the Court

believes that some degree of anxiety about a job interview is hardly evidence

of an "abnormal" condition.

102.    Furthermore, Dr. Weiss clarified at trial that his opinion was based on his

understanding that the accident resulted from Clarke's *ongoing* sleeping

problems.  (Tr. 231–34.)  However, this interpretation is not supported by any

evidence of which the Court is aware.  Dr. Robertson's account, both at trial

and in a June 25, 1999 letter to Dr. Hyde, indicates that Clarke had reported

intense sleeping problems the previous night only; he never reported a pattern

of sleeping problems, aside from an innocuous statement about having "always" been a "bad sleeper."  (Robertson ¶¶ 41–42, Pl.'s Ex. 6 at 246.)

103.    The alleged severity of Clarke's condition is also inconsistent with other evidence regarding his illness and treatment, for example:

- Clarke's relatively infrequent visits with his psychiatrist;

- Dr. Weiss's testimony that Clarke did not need medication from May 2000 to March 2002, (Tr. 255–56); and

- Clarke's physicians' tolerance of his noncompliance with medication, and the fact that, despite frequent noncompliance, Clarke has pursued the instant litigation and other disputes largely without issue.

104.    Though Clarke's depressive episodes have been associated with stressful events, Clarke has not established by a preponderance of the evidence that he has a vulnerability to the level of stress or type of stress associated with the duties of his occupation at Garrett's.

105.    While Clarke's first depressive episode occurred while he was employed as a partner at Garrett's, Clarke was faced with at least three other highly significant sources of stress—the discovery of his fiancee's infidelity, a legal malpractice suit, and disagreements with other Garrett's partners.

106.   Dr. Robertson's statement that stress related to Clarke's duties as a partner at
       Garrett's was the stressor "most prominent in Mr. Clarke's life and which he
       felt most damaging to him" is not supported by the reports of Dr. Simon
       Smith from 1998, which specifically mention only Clarke's legal malpractice
       suit and his fiancee's affair.  (Tr. 376, 400; Clarke Ex. 6 at 201–06.)  The
       statement is also contradicted by Dr. Robertson's October 1999 Mental Health
       Provider's Statement, which lists only "Malpractice Suit" under the heading
       "Work Stressors."  (Pl.'s Ex. 6 at 258.)  Furthermore, Dr. Robertson testified
       at his deposition that his June 1999 opinion that Clarke could resume full-time
       work within six months indicated that he did not believe Clarke's job was the
       determining factor in his 1998 depressive episode.  (Aetna Ex. 45 at 110–
       112.)

107.   Dr. White testified at his deposition that Clarke had worked at his occupation
       for so long without depression that one wouldn't know whether work was a
       precipitating factor in his depressive illness.  (Aetna Ex. 46 at 143–44.)

108.   Clarke's downturn after October 1998 coincided with Clarke's forced
       retirement from Garrett's, leaving him to face significant financial
       uncertainty.

109.   Clarke's experts cite Clarke's February 2000 "sabbatical" from his part-time
       work with Martineau Johnson as evidence of Clarke's vulnerability to work-

related stress.  However, while Dr. Robertson testified at trial that Clarke's work for Martineau Johnson was "chief among" Clarke's stressors at this time, a contemporaneous letter written by Dr. Robertson to Dr. Hyde makes no such statement; in fact, Dr. Robertson reports that Clarke had described "a number of current stresses," including two legal disputes and his daughter's diagnosis with dyslexia.  (*See, e.g.,* Robertson Aff. ¶ 52; Clarke Ex. 6 at 78.)

110.    Clarke's subsequent episodes were also associated with life stresses unrelated to Clarke's occupational duties.  In October 2001, Clarke's disability benefits were terminated.  In February 2002, Clarke's appeal of his termination of benefits was denied.  At each of these times, Clarke was confronted with significant financial uncertainty.

- Clarke's depressive episode in 2002 was not associated with work-related stress at all, but with the termination of Clarke's disability benefits and the denial of his appeal of the termination.  Indeed, Dr. White testified that the relapse was "likely" precipitated by Clarke's concerns about his disability benefits,  (Tr. 295);

- Though Dr. Weiss testified that if Clarke had worked more than two days per week between January 1999 to October 2002, he would "in all likelihood, [have] regressed during that time," he provided no basis for this opinion.  (Weiss ¶ 21.)

111.   Clarke also has not demonstrated by a preponderance of the evidence that any
       alleged vulnerability to stress or relapse would persist despite appropriate
       treatment.

112.   As all of Clarke's experts concede, Clarke has not always complied with the
       treatment recommendations of his physicians.  One cannot conclude based on
       any vulnerability or disability that Clarke exhibited while non-compliant that
       such condition would persist if Clarke were properly treated, or that regular
       treatment would not control non-compliance.

113.   Furthermore, Clarke never attempted to return to full-time work, with or
       without medication, and there is no evidence that Clarke's physicians ever
       attempted to develop a treatment program that would enable Clarke to return
       to work, to better cope with stress, or to perform whatever occupational duties
       he believes he is unable to perform.

114.   The Court does not accept the conclusory opinion, offered by all of Clarke's
       experts, that no treatment would be effective in allowing Clarke to return to
       his former occupation.  Clarke's experts provide either no explanation or no
       convincing explanation for this conclusion.  For example, Dr. Weiss lists a
       number of features of Clarke's illness that allegedly support his opinion that
       Clarke's condition is permanent and untreatable, yet he provides no

explanation of how or why any of these factors support this opinion.  (Weiss

¶ 26.)

115.   In addition, the opinion is contradicted by much of the trial testimony and

evidence, including the inconsistent statements of Clarke's own experts.  For

example:

- Dr. White testified at trial and stated in a June 20, 2002 letter to Dr.

  Hyde that "clearly," one advantage of remaining on prophylactic

  medication was "the reduced risk of further relapse."  (White Aff.

  ¶ 54; Pl.'s Ex. 6 at 191.)  He also stated in an October 2006 letter to

  Dr. Hyde that a benefit of maintaining Clarke on medication would be

  "hopefully . . . that he will be less likely to have a relapse," (Pl.'s Ex. 7

  at 20);

- Dr. Robertson testified that while medication would not "cure"

  Clarke's vulnerability to stress, it might "control or modify" it, (Tr.

  395), that vulnerability to stress might be mitigated using medication

  or by psychological support, (Tr. 375), and that there is research

  indicating that cognitive behavioral therapy may be effective in the

  treatment of endogenous depression, (Tr. 358);

- Dr. Weiss testified that when a person with a biological predisposition

  to depression is under stress, cognitive therapy will not be helpful in

  preventing a relapse.  (Tr. 210.)  However, Dr. Weiss cited no research

or other authority to support this latter statement, which is directly contradicted by Dr. Robertson's testimony;

- Dr. Weiss also testified that he did not believe that medication would reduce Clarke's vulnerability to stress. However, he had previously testified that he would have recommended a mood stabilizer as a treatment that could potentially help to address Clarke's residual symptoms of depression and risk of relapse, (Tr. 256–57);

- Finally, as Dr. Block points out, this opinion is contradicted by the considerable evidence presented at trial indicating that Clarke's depression *was* in fact responsive to medication.

116. Dr. Robertson cites "research" that allegedly indicates that the risk of relapse increases by approximately 16% with each depressive episode and that only 25% of people who have experienced a major depressive episode will require no subsequent treatment and experience no relapse. (Robertson ¶ 16.) Clarke's experts also list various other factors that allegedly increase the likelihood that Clarke will suffer a relapse, such as the presence of psychotic features and the severity of his 1998 depressive episode. However, this evidence, even if accepted, does not satisfy Clarke's burden to show that he is unable to work in his regular occupation, given the lack of evidence that Clarke's work at Garrett's was the unique or even primary cause of his depressive episode. As noted, multiple stressors had converged in Clarke's life at the time he suffered the episode, including the discovery of his

fiancée's infidelity and the malpractice suit pending against him.  Though his job at Garrett's might also fairly be called a stressor, it was the only one of the set that did not arise precipitously, as Clarke's high-pressure work had been a constant in his life since long before the depressive episode.

## CONCLUSIONS OF LAW

1.     This is an action for breach of contract.  This Court has diversity jurisdiction

pursuant to 28 U.S.C. § 1332.  Therefore, New York law applies.  *See Clarke*

*v. Aetna Life Ins. Co.*, 471 F. Supp. 2d 463, 469 (S.D.N.Y. 2007) ("In a

diversity action such as this one, a court must apply the substantive law of the

state in which it sits, New York in this case.").


2.     Under New York law, Clarke bears the burden of proving that he is entitled to

benefits under the Policy.  *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121,

124 (2d Cir. 2000); *Napoli v. First Unum Life Ins. Co.*, 2005 WL 975873, at

*7-8 (S.D.N.Y. April 22, 2005) (holding that insured had burden to prove that,

due to risk of heart attack, "he was unable to perform . . . his occupation").


3.     In determining whether Clarke was entitled to disability benefits under the

Policy, the threshold question is whether Clarke was totally or partially

disabled under the Policy at any time after his benefits were terminated.  Only

after it is determined that Clarke met the requirements of one of these

disability provisions would the Court need to consider whether Aetna was

nevertheless permitted to deny benefits to Clarke under another provision of

the Policy, such as the Proof of Loss provisions (VI.C.) or the regular care

requirement (III.D.1.).  Because the Court finds that Clarke has not proven

that he was either totally or partially disabled during the relevant period, the

Court need not address these issues.

4.     "As with any contract, unambiguous provisions of an insurance contract must

be given their plain and ordinary meaning."  *White v. Continental Cas. Co.*, 9

N.Y.3d 264, 267 (N.Y. 2007).

**Total Disability**

5.     The Policy provides the following definition of "Total Disability": "solely

because of an illness, pregnancy or accidental bodily injury, an insured partner

is unable . . . . [t]o perform each of the material duties of [the] regular

occupation on a full-time basis."

6.     In a recent opinion, this Court summarized the construction typically given

"total disability" clauses by courts applying New York law: "[A]n insured is

totally disabled if he or she is no longer able to perform the 'material' and

'substantial' responsibilities of his or her job.  Put differently, an insured is

totally disabled where his condition prevents him from performing work of

the same general character as the insured's previous job, requiring similar

skills and training, and involving comparable duties." *Hershman v.*

*Unumprovident Corporation*, No. 06 Civ. 5604(RJH), 2009 WL 3076074, at

*3 (S.D.N.Y. Sept. 25, 2009) (citations omitted).  The Court construed the

policy in *Hershman* to mean that the insured would be considered "totally

disabled" if his injury rendered him incompetent to perform work of the

"same general character" as that which he performed previously,

notwithstanding any continued ability to perform a limited number of duties

that were "important" in his old job.  *Id.* at *5.

7.      The language in Clarke's policy, however, is stricter than that found in

*Hershman*.  Whereas Hershman's policy defined "total disability" as an

inability "to perform the important duties" of his occupation, Clarke's policy

defines it as the inability to perform "*each* of the material duties" of his

regular occupation.  *See id.* at *1.

8.      Courts disagree over the proper interpretation of this stricter language.  Some

have construed it to require that an insured be "completely unable to carry out

every important and essential component of [their] occupation." *Keiser v.*

*First Unum Life Ins. Co.*, 2005 WL 1349856, at *16 (S.D.N.Y. June 8, 2005)

(quoting *Doe v. Cigna Life Ins. Co. of N.Y.*, 304 F. Supp. 2d 477, 499

(W.D.N.Y. 2003)).  Others have found that the language, despite its apparent

clarity, nonetheless merits a "reasonable interpretation" under which the

insured will be found totally disabled if he cannot perform in the "usual and

customary way," regardless of whether he or she can still carry out certain

material duties.  *See Blasbalg v. Massachusetts Cas. Ins. Co.*, 962 F. Supp.

362, 368 (E.D.N.Y. 1997) (citing *Niccoli v. Monarch Life Ins. Co.*, 70 Misc.2d

147, 150-51 (N.Y. Sup. Ct. 1972).

9.      It is not necessary to resolve this interpretive issue in the present case, because
the controversy here is more factual than legal: does Clarke in fact have a
condition, or an "illness, pregnancy, or accidental bodily injury," in the words
of the policy, that actually limits his ability to perform the duties of his old
job?  In other words, looking at the Policy's definition of "total disability,"
this case implicates the word "unable" more than the terms "each of the
material duties" or "regular occupation."  While in *Hershman* there was no
dispute as to the precise consequences of the plaintiff's injury—all agreed that
it prevented performance of a particular set of medical procedures that
accounted for as much as 50% of his pre-disability work duties—here the
salient question is whether Clarke suffers from such a severe, chronic
susceptibility to stress that it is impossible for him to return to his old job as a
senior partner at a large law firm, or to any similar position.

10.     Clarke is "unable" to work in his occupation if it would be impossible for him
to do so "without hazarding [his] health or risking [his] life."'  *See Napoli v.
First Unum Life Ins. Co.*, No. 99 Civ. 1329(GEL), 2005 WL 975873, at *7
(S.D.N.Y. April 22, 2005); *see also Lasser v. Reliance Standard Life Ins. Co.*,
146 F. Supp. 2d 619, 628 (D.N.J. 2001) ("an insured is disabled when the
activity in question would aggravate a serious condition affecting the
insured's health").

11.  A slight risk of harm from occupational stress is not sufficient to render a person disabled.  *Napoli*, 2005 WL 975873 at *8.

12.  An individual is not considered unable to perform the material duties of his job if he is able to perform such duties satisfactorily or adequately, though not necessarily at his previous level of performance or in accordance with his own standards or expectations for himself.  *See, e.g., Keiser v. First Unum Life Ins. Co.*, 2005 WL 1349856, at *10, 16–17 (S.D.N.Y. 2005) (finding that "although [plaintiff] may not have lived up to her own standards" after suffering injuries in a car accident, plaintiff did not qualify for disability benefits in light of "satisfactory" and "adequate" performance of same occupation with new employer).

13.  In determining whether Clarke would be "hazarding his health or risking his life" by returning to work as a senior partner at a large law firm, the Court, as fact-finder, is not required to give deference to the opinion of a treating physician.  *See, e.g., Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (holding that plan administrators are not required to defer to the opinions of treating physicians when making determinations regarding eligibility for disability benefits under plans covered by the Employee Retirement Income Security Act of 1974 ("ERISA")); *Connors v. Conn. General Life Ins. Co.*, 272 F.3d 127, 135 & n.4 (2d Cir. 2001); *Keiser v. First Unum Life Ins. Co.*, 2005 WL 1349856, at *15 (S.D.N.Y. 2005); *Napoli v.*

*First UNUM Ins. Co.*, 99 Civ. 1329 (GEL), 2005 WL 975873, at *7 (S.D.N.Y. Apr. 22, 2005) ("Courts reviewing [a claim for disability benefits] . . . are free to consider all the evidence, without giving special deference to the treating physician's opinion.").

14.     A court may evaluate a treating or a non-treating physician's opinion "in the context of any factors it considered relevant, such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." *Graham*, at *2 (citing *Connors* at 135); *Keiser*, 2005 WL 1349856, at *11.

15.     "[C]onclusory allegations, unsupported by competent evidence in the record," need not be credited. *Monga v. Sec. Mut. Life Ins. Co. of New York*, 2002 WL 31777872, at *5 (N.Y. Sup. 2002); *Straehle v. INA Life Ins. Co. of N.Y.*, 392 F. Supp. 2d 448, 459 (E.D.N.Y. 2005)(discounting physician's conclusion where physician did not explain why the evidence supported the conclusion that the plaintiff was unable to perform the duties of her occupation but "merely ma[de] conclusory statements that her ability to do these tasks has been compromised").

16.     For the reasons stated in the Findings of Fact, including the limited weight given to the opinions of Clarke's treating physicians, the Court concludes that Clarke has not demonstrated by a preponderance of the evidence that he is

unable to return to his regular occupation "without hazarding [his] health or risking [his] life."' *See Napoli*, 2005 WL 975873 at *7. Though Clarke's depression certainly disabled him for some period in 1998, he has not proven that at any point *after* his benefits were terminated on October 24, 2001, he has suffered from such a severe, untreatable, and persistent vulnerability to stress that it would be dangerous for him return to work as a senior partner at a large law firm. He therefore is not entitled to total disability benefits under the Policy. *See id.*


**Partial Disability:**

17.     Under the Policy, Clarke is partially disabled if he "cannot fully perform the duties of his…regular occupation solely because of an illness, pregnancy, or accidental bodily injury . . . ."


18.     Clarke is not entitled to benefits under this provision for the same reason he is not entitled to total disability benefits: he has not shown, by a preponderance of the evidence, that he cannot return to his old job or perform any aspect of his duties there. Since Clarke has not otherwise proven that he is incapable of "fully performing" the duties of his regular occupation, the Court's finding that the evidence does not show that it would be a hazard to his health or a risk to his life to work as a senior partner at a large law firm removes Clarke from the scope of total and partial coverage alike.

19.     If the Court had found Clarke "unable" to return to a position similar to that which he held at Garrett's, then the issue of his entitlement to partial disability benefits would have arisen if the Court also found that Clarke's manifest ability to perform some of the duties of his old job—albeit as a consultant and solo practitioner, rather than a supervising partner—disqualified him from receiving total benefits.  *See, e.g., Simon v. Unum Group*, No. 07 Civ. 11426(SAS), 2009 WL 857635, at *5 (S.D.N.Y. Mar. 30, 2009).  But given the Court's finding on the threshold question of Clarke's ability *vel non* to return to his old job, it does not reach the question of whether Clarke's current legal practice evinces a lack of "total disability," or whether he is otherwise entitled to partial benefits.

## CONCLUSION

Because Clarke has not demonstrated by a preponderance of the evidence that he was entitled to total or partial disability benefits under the Policy, he has not met his burden to show that Aetna is liable for breach of contract, and judgment is granted in favor of Aetna. The complaint is dismissed and the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
        December 1, 2009

Richard J. Holwell
United States District Judge

54